# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### SOUTHERN DIVISION AT PIKEVILLE

HILDA L. SOLIS, Secretary of Labor,  :
United States Department of Labor,   :
                                      :
                Plaintiff,            :
                                      :
            v.                        :       Civil Action No. _____
                                      :
FREEDOM ENERGY MINING COMPANY  :
and                                   :
SIDNEY COAL COMPANY, INC. d/b/a  :
FREEDOM ENERGY MINING COMPANY,  :
                                      :
                Defendants.           :

## DECLARATION OF DAVID ISON

I, David Ison, state the following:

1.      I am the Acting Assistant District Manager for District 6, Pikeville

Kentucky. I began employment with the Federal Mine Safety and Health Administration

(MSHA) in January 1989. I worked as a coal mine inspector, accident investigator and field

office supervisor as well as my current position.

2.      During my experience in MSHA as a coal mine inspector I have been

responsible for coordinating the complete inspection of large complex underground mines,

surface mines, and surface facilities. My duties involved obtaining respirable dust samples,

noise surveys, and rock dust surveys. I also had to coordinate the examination of outby airways,

equipment, and mine faces.

3.      As an accident investigator with MSHA, I have planned investigations

coordinating the efforts of Technical Support personnel, District personnel, and various state

agencies.

4.    In my duties as field office supervisor and ventilation supervisor I have planned, developed and coordinated programs to track and ensure that inspection programs are conducted in accordance with policies and procedures.

5.    I received a BS in Civil Engineering in May 1977. I am a certified Professional Engineer, a Kentucky licensed Land Surveyor, an accident investigator, mine rescue judge. I am a certified underground and surface foreman in the state of Kentucky.

6.    Prior to my employment with MSHA, I worked for Leeco Coal Company from March 1987 to October 1988 as mine superintendent; for Golden Oak Mining Company from April 1985 to November 1986 as mine superintendent, from November 1983 to April 1985 as mine foreman, February 1982 to November 1983 as Mine Superintendent; and for Blue Diamond Mining Inc. from June 1981 to March 1982 as section mine foreman and from March 1978 to June 1981 as project engineer, from June 1977 to March 1978 as a transit man for Southeast Coal Company and from 1973 to 1977 part-time transit man for Scotia Coal Company. My duties as a union steward have given me valuable experience in these areas also.

## FEDERAL MINE SAFETY AND HEALTH ACT INSPECTIONS

7.    The Federal Mine Safety and Health Administration (MSHA) is required to do four complete inspections of all underground coal mines each year. For this purpose, MSHA divides the year into quarters beginning in October and ending in September. The quarterly breakdown is: first quarter October 1-December 31, second quarter January 1-March 31, Third quarter April 1-June 30 and forth quarter July 1-September 30. These inspections are done by one or more inspectors. Every part of the coal mine is examined, and due to the nature of the exam, some parts of the mine are examined more than once during this inspection. MSHA performs other types of inspections that are not counted toward this quarterly requirement. For

instance, mines that liberate high amounts of methane gas are inspected on a regular 5, 10, or 15 day basis depending on the amount of methane liberated. Also MSHA conducts investigations into accidents, and unintended roof falls, inundations of gas or water.

8.     MSHA also recognizes that some mines warrant frequent inspections because the working conditions at those mines present a serious hazard to those who work there. Since April 2010, MSHA has performed impact inspections of these mines. Impact inspections are scheduled nationally based on prior compliance history and dangers present at a particular mine.  Prior to April 2010, these inspections were less formal in the sense that they were directed by a particular district's needs and were called saturation inspections.  Both the impact and saturation inspections involve groups of inspectors who examine the mine as a whole all at one time.  MSHA employees monitor company communications underground, and the statutory prohibition against advance notice is strictly enforced.  These inspections are necessary because it is so easy for a company with a poor safety record to hide certain types of violations from the regular inspector traveling alone or even a combined inspection party whose inspection is not a coordinated effort.

9.     MSHA also conducts specialized inspections relating to roof or ventilation system reviews.  If a mine presents specific issues outside the knowledge of the regular inspector, specialists from the District or even the Technical support group examine the mine.

10.     Citations and or Orders are only issued by an authorized representative (AR) of the Secretary of Labor. Each AR is an inspector, but not every inspector or specialist is an AR.  An AR carries credentials that allow for right of entry on mine property, rights to examine books and papers, and the right to perform tests as needed.  The right to books and records is not limited to those records listed in the regulations but may include any such record

that the Secretary deems necessary to complete his or her examination. Certain orders issued under section 104(b), (d)(1) and (d)(2), 103(j) and (k), and 107(a) will require closure of parts or all of a mine. Another order under 103(g) requires removal of a miner without proper training.

**FREEDOM ENERGY NO. ONE MINE**

11.     In my current position as Acting Assistant District Manager, I deal with compliance issues at the mines assigned to this district. One of these mines is Freedom Energy No. 1 mine. I am familiar with the compliance history of this mine as a result of my current job duties. I have personally inspected this mine underground. I have also reviewed citations, orders and notes in the mine file as well as plans and other documents in the official mine file for this operator.

12.     The Freedom Energy No. 1 mine is inspected out of District 6, Pikeville Kentucky. It is a relatively large mine and there may be a number of inspectors at the mine on any given day. Because of the size and nature of the duties, inspectors at this mine may travel in pairs as well. The mine is on a 103(i) spot due because it liberates 1.8 million cubic feet per 24 hour period. In the last few years, because of the number of serious life threatening conditions found by MSHA at this mine, it has become a drain on the district's inspection resources. It is not unusual for three to five inspectors in groups of one or two to be at the mine in any given day.

13.     MSHA provides the industry with various statistics regarding number of violations per inspection day. At a typical mine, this figure has real meaning because the mine does not require additional task force type groupings for MSHA to know what is going on daily. At Freedom, however, this number means less because two or three inspectors were required on

a single inspection or because inspectors stayed at the mine night and day during a crisis situation with a roof fall or gas liberation event and no real inspection activities were done.

14.     Freedom has been the subject of enhanced or saturated inspections for several years. Each of these types of inspections were a response by MSHA to meet a particular concern regarding life threatening conditions found at the mine. An enhanced enforcement effort allows MSHA to be in multiple sections of the mine at the same time. Operators with ventilation problems often direct air from one section of the mine to another when only one inspector is at the mine but this practice cannot be so easily hidden during a saturation inspection. Likewise, MSHA does not know that an employee has called underground and given notice that an inspector is on the way if the inspector is traveling alone or in a small group. If there are numerous MSHA personnel present, one may stay on the surface and monitor conversations between employees on the surface and those underground and monitor communications for such illegal advance notice of an impending inspection.

## RECENT ACTIVITY AND ATTEMPTS TO GAIN COMPLIANCE

### Freedom Energy Mine Number One

15.     I have reviewed the inspection notes for the mine as well as my calendar of meetings and other records of the Federal Mine Safety and Health Administration District 6. Those records reflect the following information concerning this operation between October 5, 2008 and the present:

16.     On October 5, 2008, a roof fall occurred at the location of the A set of seals. Seals are barriers that separate old unventilated worked out areas of the mine (old works) from the active workings. If a seal is compromised, the atmosphere from the old works may leak into the area where men work or travel. The fall was 4.5-5 feet thick by 18 feet wide by 40 feet

long. The immediate roof in the area was laminated shale which has historically caused roof control problems. The location of the fall was originally mined by Island Creek in 1980's. Mine records show that the seal was last inspected on October 1, 2008. The fall damaged the No. 1 seal.

17.    On October 10, 2008, a miner working in the number three entry was hit by a falling piece of draw rock. Draw rock consists of pieces of the immediate mine roof that fall between and around the roof bolts. The miner suffered a broken bone in his hand as a result of this rock fall.

18.    On October 14, 2008, a miner who was helping with air lock doors was hit by a piece of draw rock. The rock hit his shoulders and back area. He missed two weeks of work due to his injury from this accident.

19.    On October 22, 2008, Freedom discovered a roof fall in the number one return entry. The fall was 19 feet wide by 60 feet long by 8 feet thick. The fall occurred between an intersection in the return adjacent to the B6 belt 5,000 feet from working section outby the B7 head drive. Outby is a directional term meaning away from the place where coal is mined The main roof in the fall location was laminated shale. The area was mined 12 months prior to fall.

20.    On October 23, 2008, CMI Billy Buchanan met with mine foreman Kevin Varney and discussed these roof falls. Buchanan told Varney that Freedom needed to keep a check on standard support to see if changes could be detected and that MSHA was concerned with the operator's roof support efforts.

21.    On October 26, 2008, a roof fall occurred in primary escapeway in the number one intake entry, 1560 feet from working section. The fall was 18 feet wide by 10 feet

long by 3-5 feet thick. A cutter was present along the right rib and in the middle of the intersection. Cutters are cracks that appear due to stress caused by failing roof support. A gas well was located 21 crosscuts from this area. The mine roof was made of laminated sandstone.

22.    On December 3, 2008, a miner was installing a guard under a belt while the belt was running. He got his left arm caught between the belt and a roller. He received a fracture and burns to his left shoulder and wrist.

23.    On January 15, 2009, a roof bolter operator was hit with a piece of rock that was three feet wide by three feet high by 2.1/2 inches thick. The miner was drilling a hole when the draw rock fell and injured his arm. On March 27, 2009, a miner was injured when a loose draw rock and a roof bolt hit him on the right shoulder while he was scaling down loose rock. He suffered a contusion to his right collar bone. The rock was 5 feet wide by 27 inches long by 5 inches thick.

24.    On April 7, 2009, CMI Thacker met with Superintendent Pinson. Pinson said that Freedom was going to do a better job on cleaning dust in the mine. Pinson reported the next day that he had meetings with all three crews on the 001 working section about dust accumulations and that they now understood how important that is.

25.    On April 9, 2009, Thacker was traveling with mine foreman Jerry Varney when they came across a belt that was written up in the pre-shift book because of coal dust and float coal dust. While they were discussing the condition, the belt stopped running and the mine foreman and belt examiner both started shoveling dust from the belt. It took several miners 35 minutes to clean this belt.

26.    On April 13, 2009, a miner discovered a roof fall in the intake number seven entry on the 001 working section. The fall was located 12,000 feet from the working

production face. The fall was 20 feet long by 20 feet wide by six feet high. On April 14, 2009,
Superintendent Pinson admitted that the cause of the roof fall was deterioration of the roof.

27.    On April 24, 2009, a miner was injured when he was hit by draw rock while
rock dusting.

27.    On April 27, 2009, CMI talked to Kenny Hunt about the importance of
checking on the mine roof conditions. This is following a week of meetings with miners about
draw rock and loose roof.

28.    On May 4, 2009, a miner was walking down the track and hit a loose rock
with his head. The rock fell and struck him on the left forearm and wrist. He received stitches
for this laceration.

29.    On May 13, 2009, CMI Thacker talked to Jerry Varney, mine foreman,
about the importance of putting dates, times and initials at required locations underground as
proof that the area was examined as required. This was after MSHA found that there were
problems in mine examinations at Freedom.

30.    On May 20, 2009, Superintendent Pinson said that he met with Freedom's
belt examiners and discussed the requirement that all hazards be recorded in the appropriate
book.

31. On June 23, 2009, a roof fall occurred on the 001 MMU. The fall was 20 feet
wide by 50 feet long by 6 feet wide.

32.    On May 27, 2009, MSHA discussed the lifelines and man door violations
with superintendent J. J. Pinson.

33.    On June 23, 2009, a roof fall occurred on the 001 working section in the
number four entry. The fall was 20 feet wide by 50 feet long by six feet high.

34. On June 24, 2009, MSHA met with various officials from Freedom to discuss the ongoing issues related to roof control at the mine.

35. On July 6, 2009, CMI Thacker held a safety talk with the day shift and talked about roof control.

36. On July 9, 2009, MSHA found water impounded behind the C1 seal set. Field office supervisor Mike Sergent, District Manager Norman Page and ventilation specialist Randy Newsome met with Sidney Coal Company engineer Randy Tackett about the water. Seals are not built to impound water, and any water behind a seal is likely to cause deterioration and possible leakage of the atmosphere in the old works. This includes leaks of methane and carbon monoxide. MSHA calculated that the water reached the mine roof behind the seals. The company estimated that 315 million gallons of water were impounded behind the seals. Company chief engineer J. Cline estimated that if the seals failed, the northwest submains, 010 active workings, C2 Northeast panel, first southwest submains, and the slope and elevator shaft would be flooded. This included five feet of water at the elevator shaft.

37. On August 11 and 20, 2009, Freedom reported figures that established that the atmosphere behind two sets of seals were explosive.

38. On August 18, 2009, CMI Workman talked to miners about roof accidents and the explosive range behind the C1 seals.

39. On September 21, 2009, an outby foreman told CMI Carter that the number six seals always produced water.

40. On September 22, 2009, a weekly examiner found a roof fall in the number 11 belt. The fall blocked a bleeder, and the area was marked to prevent access. Bleeders are ventilation passages that take methane and other noxious gases away from the working faces.

41.    On September 23, 2009, CMI Buchanan observed Jerry Varney during a weekly examination and stated that he had good working knowledge of his duties as an examiner.

42.    On September 24, 2009, MSHA inspectors monitored a test of the CO monitoring system and concluded that the responsible person, Kenny Clark, had a good knowledge of his duties and understands the responsibilities of his position. The system monitors the amount of carbon monoxide in the belt entries. This is to give notice of potential belt fires. The position of responsible person is in charge of the emergency notification and evacuation of the mine in the event of a major emergency or fire. That day, CMI Workman held a safety talk with five miners about checking the roof and ribs in their work area.

43.    On September 27, 2009, inspectors held a safety talk with the midnight crew about roof and ribs, checking for loose materials, and miners' rights.

44.    On September 30, 2009, MSHA held an end of year closeout conference with Steve Endicott, J. J. Pinson and Terry Smith. The parties talked about the number of roof control and dust violations issued at this operation and how to avoid repeat violations of the same type. MSHA expressed concern about the condition of the part of the mine outside the working production sections. Superintendent Pinson stated that Freedom is working on repairing the mine roof if problems arose.

45.    On October 8, 2009, a roof fall occurred adjacent to number 19 belt line in the track entry. The roof fell on a high voltage cable which cut the power to 001 mechanized mining unit. The fall was 30 feet long by 20 feet wide and 12 to 14 feet thick. It occurred 2000 feet outby 001 section. Pressure of the fall caused draw rock to fall as well.

46.     On October 9, 2009, Roof specialist Ricky Runyon met with John Ball, foreman, and Dean Joyce, chief electrician concerning roof support issues at the mine.

47.     On November 12, 2009, MSHA conducted an enhanced enforcement inspection at Freedom.  During the inspection, MSHA discovered that the belt books for all of the belts with the exception of nos. 14 and 17 showed accumulations.  The belt book entry for November 11 showed that the belts were inspected by SW (Steve Wire) but Wire did not examine the belts during the shift noted.  MSHA issued a violation for inadequate belt examinations and required that all of the examiners be retrained.

48.     On November 18, 2009, Gary Frampton, an employee of Massey Energy, performed training for 55 miners on how to define a hazard, how to record one on examination, and how to do a proper adequate exam.  CMI Phillip Carter sat in the training.  There was a roof fall in the bleeder at Freedom that day.

49.     On December 2, 2009, CMI Wendall Hall discussed with Mine Superintendent J. J. Pinson, foreman Rodney Chapman and the 010 section crew the requirements for retreat mining including proper timber size, the retreat mining pillar plan, dust perimeter checks, rock dusting, and ventilation on the section.

50.     On December 9, 2009, an MSHA inspector discussed with section foreman John Anderson the requirement to place dates, times, and initials underground during examinations to establish that the examination was actually performed. On January 5, 2010, CMI Preece talked to mine superintendent J. J. Pinson about roof control violations received by the operator.  Pinson told Preece he intended to work on certain outby areas and bolts that have a lot of half headers on them. Both agreed company had a lot of work to do.

51.    On January 5-6, 2010, MSHA inspectors found that the belt air for the 4A beltline was traveling in the wrong direction. Foreman Slone admitted that after several readings the air still was traveling in the wrong direction.

52.    On January 8, 2010, a number of inspectors including supervisor Mike Sergent met with mine superintendent Pinson, mine manager Varney and company president Charles Bearse. The inspectors discussed the problems with ventilation controls, face ventilation practices, methane monitor problems, and bad habits in areas out from the working section MSHA discovered that week during the emphasis inspection. On January 19, 2010, CMI Wendall Hall discussed importance of doing complete pre-shift examination adequately within three hours of start of shift with two mine examiners. The time frame for performing pre-shift examinations is critical so that the oncoming shift has recent information about mining conditions.

53.    On February 4, 2010, a rock fell on the deck of the roof bolter and as a result, the bolter tilted to the rear catching the roof bolter operator's hand between the canopy and the miner roof. The miner was permanently disabled as a result of this accident.

54.    On February 5, 2010, MSHA managers Tim Watkins, Mike Sergent, Craig Plumley, Stevie Justice, Jerry Bellamy, David Steffey, and Bob Bates talked with Freedom managers Greg Biliter, J. J. Pinson, Steve Endicott about continuous face ventilation. Continuous ventilation is critical in a mine with high levels of methane. This assures that the face is swept clear of methane accumulations.

55.    MSHA became increasingly concerned about the examination practices at the mine. For example, on February 24, 2010, cribs were dislodged by a shuttle car in an area where a roof fall had previously occurred. The condition left a large section of unsupported roof

on a travelway that was frequently used. MSHA found the condition on the evening shift well after at least two examiners had been through the area. Mike Sergent, Field office supervisor and Wendall Hall discussed the continued failure of the examiners to leave dangerous conditions unreported and uncorrected even though the examiners had retraining on hazard recognition after a prior set of violations for the same practice. Jeff Hackney, mine foreman, was told that higher enforcement would be used to achieve compliance on examinations.

56.    At the end of the shift on February 24, 2010, Mine superintendent Pinson promised MSHA that he would have a very detailed and in depth discussion with the mine examiners concerning their duties.

57.    On February 28, 2010 Wendall Hall had a detailed discussion concerning the importance of doing a proper and complete examination and the importance of proper methane checks with mine managers. Persons present were Terry Loony, mine foreman; Todd Chapman, 001 3rd shift foreman; Brad Stanley, 010 MMU foreman, and Joe Adkins, outby foreman.

58.    On March 1, 2010, Wendall Hall discussed the importance of not having combustible material on the power box with the midnight shift crew, and Billy Buchanan spoke to the 004 day shift crew about the recent methane on the working sections and the effect of barometric pressure on mine gasses.

59.    The operator also failed to keep the weekly examinations up to date. On March 14, 2010, MSHA discovered that the last weekly examination for the water sprinkler warning device on the B2 belt was dated March 2, 2010.

60.    During discussions about supply haulage on March 15, 2010, Superintendent Pinson admitted that a lot of bad practices were used and that the supply and rock dust crews would be trained in haulage practices.

61.    MSHA held a close out conference for the end of the second quarter on March 30, 2010.  Freedom managers J. J. Pinson, mine superintendent; Steve Endicott, safety director; Dean Joyce, foreman; Terry Smith, foreman; Jerry Varney, foreman; and Charles Conn, foreman.   The parties discussed the need for improvement, areas that need more attention, and what means the operator would use to prevent recurrence of the violations, hazards and accidents at this mine. Specifically the parties covered the subjects of roof control and ventilation.

62.    On March 30, 2010, a roof fall occurred in the number six entry on a section close to a gas well.  The fall occurred in the last open crosscut and the right crosscut.  It was twenty feet wide, forty-five feet long and seven feet thick.  The roof was laminated shale and sandstone. Test holes in the section established separation of the strata above the mine roof in several locations across section.

63.    On April 6, 2010, Keith Preece issued violations on 004 section for insufficient air in last open crosscut, and a curtain which was down one crosscut away from the section. Jerry Varney was upset with S&S designation on citation. Preece told him that the mine liberated over 2 million cubic feet of methane in 24 hour period (at that time), and that the plan sets out the minimum air flow on in the last open crosscut on the section.  Varney said he thought that the plan requirements only applied if you were running coal.  Preece told that the operator always has to maintain minimum ventilation.

64.    On April 6, 2010 during a dust pump survey of section, Freedom managers had problems getting water on the miner. It took the operator two hours to get water on

14

the continuous miner. Water sprays on the miner operate to limit float coal dust in the atmosphere and also limit any potential sparks produced by miner drill bits hitting hard rock. Without water, the miner will produce large amounts of dust, and the bits present a potential ignition source.

65.    On April 6, 2010 MSHA received a 103(g) complaint that the district inspectors were too tough on Freedom and were shutting the mine down for no reason. During the inspection associated with this complaint which took place between April 6 and April 15, 2010, MSHA issued 206 citations and orders.    On April 8, 2010 alone, MSHA issued 60 violations.

66.    On April 8, 2010, an MSHA inspector issued a violation for Lo Track forklift. Freedom's electrician told the inspector that he knew the unit was in bad condition and needed to be removed from service, yet it was in operation at time of inspection.

67.    On May 10, 2010, CMI David Thacker found that Freedom moved the belt during the night shift on the day before and left 50-100 feet of accumulations of coal dust that had been under the belt. He found that the material was patted down flat and that 50 feet of accumulations were rock dusted. Thacker questioned mine foreman Kevin Varney about the night shift foreman's responsibilities concerning the belt move. Varney went to the belt location and turned the belt off. When he returned, he brought four miners with him to clean the belt, but he only had three shovels. The five Freedom employees proceeded to clean the accumulations left during the belt move.

68.    On May 12, 2010, CMI Preece found a miner sitting on the 17A belt transformer. He issued an imminent danger order and gave miners working in the area a safety talk about the hazards surrounding an energized 12,470 volt power center.

69.     On May 17, 2010, MSHA conducted a saturation inspection at 6:30 p.m. on the second shift. Five MSHA inspectors were present during this inspection. MSHA monitored communications on the mine phone which prevented those on the surface from telling those underground that inspectors were on the way. One CMI who went to the 001 MMU stated that the curtains directing ventilation on the section were "shabby at best." Freddie Carroll, mine foreman, admitted that required line curtains were probably missing for the entire shift. He was driving the scoop and working as section foreman and told the CMI it was difficult to do both jobs at the same time. MSHA issued a 104(d)(2) order closing the mine based on ventilation violations that night. In addition, inspectors found large amounts of coal dust accumulations with an energized cable laying in coal dust.

70.     On May 20, 2010, J. J. Pinson told a CMI that he was "going underground to do my job because your boss (Mike Sergent) doesn't think I've been doing it." He added that he is "responsible for health and safety of the miners." On that day, MSHA found coal dust in a belt starter box. The CMI asked mine manager Kevin Varney about the condition and he admitted that he did not know when the last time the box had been cleaned. Coal dust in a starter box is a potential fire or explosion source. When the inspector arrived on the surface, Varney argued about the negligence finding and stated that the boxes are scheduled to be cleaned every two weeks. Varney then produced a record that showed the last time the box was cleaned was April 26, 2010, which was three weeks and five days prior to the inspection.

71.     On June 10, 2010, CMI Preece discussed various ventilation issues with mine superintendent Pinson. Pinson said he tried everything he knew to get "his people" to "buy into it" and take corrective actions on their own. Pinson said he had no answers. Preece noted that the miners had several training classes in the prior three weeks. On this day, Preece found

several conditions on the 17B belt including coal dust accumulations, stuck and damaged rollers, and improper belt alignment. These conditions if left unattended are likely to cause a belt fire. All of these conditions would have been discovered during an adequate on-shift examination prior to the inspection.

72.    On June 11, 2010, MSHA held a meeting with Freedom management including J. J. Pinson, Superintendent; Steve Endicott, Safety Director; Gary Frampton, Massey Energy Compliance Officer; Kevin Varney, General Manager; and Greg Billiter, Engineer. The parties discussed the coal dust accumulations from June 10, 2010. MSHA requested that the ventilation plan be amended to require two on-shift examinations of the belt. Superintendent Pinson stated that they (Freedom) were adding a second person's eyes. Frampton stated that the "guy has 8 hours to make the beltline". MSHA supervisor Danny Deel stated that "they haven't been doing it". Frampton stated that yesterday (June 10, 2010) was an embarrassment and a problem. Deel told them, "You need to make sure your men are doing their job." Kevin Varney admitted that extra help is needed to examine the belts.

73.    On August 11, 2010, a roof fall occurred in the No. 7 entry in the intake air course. The fall was 240 feet long by 19 feet wide by 6 feet deep. The cable bolts and cutters in the area of the fall. The cause of the fall was stack rock and laminated shale. This fall occurred between two gas wells

74.    On August 23, 2010, a miner was hit by a piece of draw rock while exiting the forklift by the 4C belt headdrive.

75.    On September 11, 2010 a roof fall occurred on the 001 working section in the number four belt entry. The fall covered the section coal feeder and caught the end of two

Joy shuttle cars. The fall was 19 feet wide by 80 feet long by 8 feet thick.  The immediate roof in the area was shale with soft shale and sandstone.

76.    On September 13, 2010, a miner was hit by a piece of draw rock which was approixmatley 6 inches by 3 inches by ½ inch.  The fall caused lacerations in the miner's arm.

77.    On September 15, 2010, field office supervisor Sergent and CMI Preece met with mine superintendent Pinson and Chief Electrician Terry Smith to discussion communication and the tracking system.  MSHA covered its expectations concerning the tracking problems at this mine.

78.    On September 22, 2010, a roof fall occurred on the intake split that measured 250 feet long by 20 feet wide by 8 feet deep.  The fall was caused by a geological feature called a horseback in the area.

79.    On October 18, 2010 a roof fall occurred in the number seven entry 80 feet from the primary intake aircourse.  The fall was on the Number 17A belt conveyor.  Cracks were present along the left rib adjacent to the fall.  The beam formed by the roof support was separated on three different locations as seen through the test hole.

## CONCLUSION

80.    MSHA has attempted to reason with the operator.  When reasoning failed, MSHA issued citations and orders where necessary.  Through a series of meetings, MSHA put the operator on notice that there were serious life threatening conditions at this mine.  Although senior mine management agreed with MSHA's assessments during these meetings, Freedom fails to operate in a safe manner. The operator's failure to examine the mine for hazardous conditions, failure to note those conditions when they are present in the mine and the failure to correct

conditions which are noted has caused injury to miners and fits the pattern of behavior that often precedes major fatalities due to roof fall, mine fire or explosion.

81.    Based on my experience with MSHA, my training and my work history in industry, I know that the conditions at this mine are the result of a total disregard for basic mine maintenance and safety.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this the __1__ day of November 2010.

DAVID ISON
Acting Assistant District Manager
Mine Safety and Health Administration
United States Department of Labor
Pikeville, Kentucky