UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

|  |  |  |
|---|---|---|
| HILDA L. SOLIS, Secretary of Labor, United States Department of Labor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 10-132-ART |
| FREEDOM ENERGY MINING CO., and SIDNEY COAL CO., INC., | ) ) ) ) | |
| Defendants. | ) ) | |

### **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

In their memorandum in support of their motion to dismiss ("opening brief" or "Memo in Support"), Defendants Freedom Energy Mining Company and Sidney Coal Company, Inc. (collectively "Freedom Energy") demonstrated that the Complaint filed by the Secretary of Labor ("Secretary") is defective on two grounds: (1) the Secretary fails to plead facts that state a plausible claim for which this Court can grant relief; and (2) the Secretary fails to plead facts demonstrating that she took the administrative enforcement steps required by the Mine Act before she can come to federal court seeking an injunction to close a mine.  Because the Secretary has not demonstrated in her opposition brief ("Opp. Memo") that the defects highlighted by Freedom Energy in its opening brief do not so exist, her Complaint should be dismissed.

**ARGUMENT**

I. **THE SECRETARY HAS NOT PLED FACTS THAT STATE A PLAUSIBLE CLAIM.**

The Supreme Court's seminal decisions in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), establish the framework for the Court's analysis of this threshold issue. The legal standard is set forth in Freedom Energy's opening brief and need not be repeated here, save for the essential point that in order to be "plausible," a claim must plead "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 556. That factual showing must demonstrate more than "a sheer possibility" of wrongdoing. *Iqbal*, 129 S. Ct. at 1949.

Here, the alleged "wrongdoing," such as it were, is a "pattern of violation of the mandatory health or safety standards of [the Federal Mine Safety and Health Act of 1977 ("Mine Act")], which in the judgment of the Secretary constitutes a continuing hazard to the health or safety of miners." 30 U.S.C. § 818(a)(2). To support her cause of action, the Secretary alleges that Freedom Energy "violated … mandatory health and safety provisions promulgated under the Mine Act, for which violations the Mine Safety and Health Administration ('MSHA') issued citations and orders." Complaint ¶ 7. As Freedom Energy pointed out in its opening brief, "citations and orders" by themselves are merely unproven allegations – they establish nothing. *See* Memo in Support at 5-6 (citing *Wyoming Fuel*, 14 FMSHRC 1282, 1289 (Aug. 1992)). It is not until they are "final" that a citation or order rises to the level of a bona fide "violation" of a mandatory health or safety standard. *See* 30 U.S.C. § 815(a), (d). In other words, until they are "final," the issuance of a citation or order – by definition – raises only the ***possibility*** of

2

wrongdoing. If that is all the Secretary is alleging – which it is – then under *Twombly* and *Iqbal*, her Complaint comes up short.

That the term "violation" or some derivative of that term is used in Mine Act § 104(a), (b), (d), (e) and (f) to connote something less than a "final" citation or order does not militate against dismissal on this basis. As the Secretary points out, "violations" – though only alleged until the operator accepts the finding or, if challenged, final adjudication – must be abated promptly within the time directed by the citing mine inspector, and this will almost always mean in advance of an adjudication by the Federal Mine Safety and Health Review Commission ("Commission"). *See* Opp. Memo at 4; 30 U.S.C. § 814(a), (b). But the injunction power of § 108(a)(2) is an extraordinary remedy and must be construed with that reality and common sense in mind. In order to prevail on the "merits" in this case, the Secretary must demonstrate that the Freedom #1 Mine has in fact engaged in conduct that justifies closure. The Secretary's ineluctable burden, therefore, is to prove by a preponderance of evidence to this Court that the Freedom #1 Mine is an outlier among underground coal mines – that it poses such a hazard to the miners that even the Secretary's many unilateral administrative remedies have proved insufficient to protect the miners. To require anything less than that, *i.e.*, to permit the Secretary to seek the closure of a mine based on mere allegations of facts that do not distinguish the targeted mine in any material way from other mines, would raise serious constitutional concerns with the statute itself that strike at the heart of everyday notions of fairness and regulatory orderliness and predictability.

In order to meet her burden, therefore, the Secretary must be able to show, at the very least, that Freedom Energy did in fact violate the Mine Act on numerous occasions, and that the past pattern is likely to pose a "continuing hazard." Importantly, though, this Court lacks

jurisdiction to consider any fact of violation; original jurisdiction over whether any violation has in fact occurred rests exclusively with the Commission. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).  Accordingly, the Secretary must come to court on an existing record of violations either acceded to by the operator or adjudicated as such by the Commission.  She cannot meet her burden *in this Court* based on mere "citations and orders," which, as stated, are merely unproven allegations (which this Court may not pass on).  Because she does not allege that any of the unspecified citations and orders have become final, she has failed to state a claim under § 108(a)(2) – it is unfathomable to think she can have a mine shut down on lesser grounds.[1]

The Secretary's pleading defect is only compounded by the fact that her bare references to generic "citations and orders" are devoid of any context.  In paragraph 8, she cites four types of mandatory standards (six standards in total) that she claims Freedom Energy has continued to violate, but those allegations do not give this Court a plausible basis for inferring that Freedom Energy is liable for a "pattern of violation," as § 108(a)(2) requires. *See Twombly*, 550 U.S. at 556.  The analysis in *Twombly* is apt.  There, bringing an antitrust action, the plaintiffs alleged certain conduct (parallel business conduct) that, if true, at most suggested the "possibility" of conspiracy between defendants.  The Court held that without more, *i.e.*, allegations of an actual agreement between the defendants to restrain trade, the complaint did not state a "plausible"

---

[1] The Secretary's complaint that § 108(a)(2) would be defeated if she were required to make out her cause of action based on final citations or orders, Opp. Memo at 4-5, can be rejected out of hand.  That an operator is to be afforded the due process it is guaranteed through the administrative adjudication scheme created by the Mine Act before the Secretary can move to shut down its mine does not render § 108(a)(2) "defeated"; it means that the federal court is not drawn into an injunction matter until the matter is ripe for its consideration.  *Cf. Thunder Basin*, 510 U.S. at 507 (federal court lacks jurisdiction over disputes that concern, at bottom, violations *vel non* of mandatory standards).

claim of conspiracy. *See id.* at 556-57. Here, the fact that Freedom Energy has been issued "citations and orders" for alleged violations of (six) mandatory standards amounts to little more than "a naked assertion" of a pattern of violation (*see id.* at 557) – a pattern may exist, but this Court cannot reasonably differentiate the conduct of Freedom Energy at the Freedom #1 Mine from that of any other underground coal mine on the basis of these bare allegations, and thus this Court cannot reasonably infer that a "pattern" exists at the Freedom #1 Mine (let alone "four distinct" patterns, as the Secretary now asserts on page 5 of her opposition). The claim is not plausible.

The Secretary says this Court may consider "the wealth of factual detail" contained in the declarations attached to her accompanying motion to dismiss, Opp. Memo at 5 n.3, but the authority the Secretary cites for support says nothing of the kind. Under Sixth Circuit law, "[w]hen reviewing a motion to dismiss, a district court may not consider matters beyond the **complaint**." *Winget v. JP Morgan Chase Bank,* 537 F.3d 565, 576 (6th Cir. 2008) (emphasis added). And while there are several exceptions to this general rule, none is applicable here.

First, the "pleading" that is the subject of scrutiny under Rule 12 is the Complaint, and the Complaint alone. *See* Fed. R. Civ. P. 7 (distinguishing pleadings from motions), 12(b) (setting out defenses to a claim for relief in "any pleading"). The declarations filed in support of the Secretary's motion for preliminary injunction, the citations and orders attached to that motion, and the motion itself, were not attached to, referenced in, or even described in general terms in the Secretary's Complaint. Indeed, in her prayer for relief, the Secretary requests that Freedom be permanently enjoined from violating the Mine Act and makes no mention of any motion for preliminary injunction or supporting citations or orders. These documents, therefore, cannot be considered part of the pleadings for purposes of a motion to dismiss, even if now –

after the fact of filing – the Secretary considers them to be central to her cause of action against Freedom Energy. *See, e.g., Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (documents can be considered part of pleadings "if they are referred to in the plaintiff's complaint *and* are central to her claim") (emphasis added). Second, the factual assertions contained in the declarations and citations and orders are not public records or any other type of material of which this Court may take judicial notice. *Cf. Jones v. City of Cincinnati*, 521 F.3d 555, 561-62 (6th Cir. 2008); Fed. R. Evid. 201(b)(2); *see also Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).

That the Secretary tries to bury her response to this fatal defect in a footnote is not surprising in light of the utter absence of any authority supporting the proposition that assertions made in a motion for a preliminary injunction are imputed to the underlying complaint. The Secretary is the master of her Complaint, after all, and it was within her discretion to choose what to include and not to include in that Complaint. That she failed to plead sufficient facts to state a claim, whether by intent or by mistake,[2] is her responsibility, and Freedom Energy cannot be called to answer a pleading that, on its face, is inadequate.

## II.   THE SECRETARY FAILED TO TAKE THE STATUTORILY MANDATED PREREQUISITE STEPS TO SEEKING AN INJUNCTION TO CLOSE THE FREEDOM #1 MINE.

The Secretary is dismissive of the notion that the Mine Act requires she pursue administrative remedies under § 104(e) before seeking the much harsher penalty of court-ordered closure under § 108(a)(2), and she offers an interpretation of the Mine Act to that end, for which

---

[2] As shown in the opening brief (at 9-28), and further discussed below, the Secretary could not, in fact, plead a plausible claim because she has not made the mandatory prerequisite administrative finding of a pattern of violations as the statute and her regulations require.

she seeks deference. But her interpretation cannot hold up to common sense scrutiny, so regardless of whether the Court views this as a *Chevron* "Step 1" or "Step 2" question, her interpretation must be dismissed as unreasonable.

### A. The Mine Act Requires the Secretary to Pursue Remedies Under § 104(e) Before Invoking § 108(a)(2).

The Secretary stakes her opposition on the idea that Mine Act §§ 104(e) and 108(a)(2) "are different remedies that address different situations," and that the former is concerned with a pattern of significant and substantial ("S&S") violations whereas the latter is concerned with a pattern of ***any*** violations. *See* Opp. Memo at 7 & n.7. The Secretary is only partially correct. It is true the two provisions provide different remedies for different situations, but it does not follow that that the Secretary can skip over her administrative remedies under § 104(e) and pursue judicial action under § 108(a)(2) without any prior attempt to bring the operator into compliance through her own broad § 104(e) enforcement authority. Rather, the different remedies are successive: the § 108(a)(2) "situation" follows the § 104(e) "situation" where the remedy available under § 104(e) has proven unsuccessful.

The Secretary's emphasis on the different surrounding language in §§ 104(e) and 108(a)(2) only serves to highlight why her litigating position is dead wrong. Section 104(e) refers to "a pattern of violations of mandatory health or safety standards … which are of such nature as could have significantly and substantially contributed to the cause and effect of … ***mine health or safety hazards***." 30 U.S.C. § 814(e) (emphasis added). Section 108(a)(2), for its part, refers to "a pattern of violation of the mandatory health or safety standards of this Act, which in the judgment of the Secretary constitutes a ***continuing hazard*** to the health or safety of miners." *Id.* § 818(a)(2) (emphasis added). In addition to the natural and obvious parallel structure in the text of each provision which, as argued in Freedom Energy's opening brief,

7

should by itself cause the Court to construe the two provisions *in pari materia* (*see* Memo in Support at 16, 19), the reference to the "pattern" constituting a "continuing hazard" in § 108(a)(2) conveys the intent of Congress that the remedy available under that provision comes into play only ***after*** the Secretary has first identified a "pattern of violations" contributing to the "cause and effect of … mine heath or safety hazards" under § 104(e). In other words, § 104(e) gives the Secretary broad authority to address the "pattern" contributing to "mine health or safety hazards" by her own authority; if, after doing so, she is unsuccessful, and finds that the "pattern" poses a "continuing hazard," she may turn to the court for assistance under § 108(a)(2). The remedies are different, yes, but they fall along a continuum.

This construction of § 108(a)(2) is also consistent with the structure of § 108 as a whole. Paragraph 1, like paragraph 2, creates a right of action for the Secretary to seek judicial relief, including injunctive relief, in any of the six situations described in the six sub-paragraphs, A-F. *See* 30 U.S.C. § 818(a)(1). Each of those six actionable situations – (1) a failure or refusal to comply with an order or decision; (2) interference with the Secretary's official regulatory business; (3) a refusal to admit the Secretary or her representative onto mine property; (4) a refusal to permit a mine inspection; (5) a refusal to furnish information; and (6) a refusal to permit access to records – turns on a failure of the Secretary to obtain or achieve the relief or purpose she seeks after using her own administrative authority. *See id.* § 818(a)(1)(A)-(F). That this is so is further demonstrated by the fact that, for purposes of considering any such claim for relief, the federal court must accept any relevant findings of the Commission or the Secretary as conclusive if supported by substantial evidence in the whole record. *See id.* § 818(b). Obviously, administrative action comes first and, absent an attempt ***and failure*** to obtain or

achieve some type of relief or purpose through those administrative means, she may not pursue injunctive relief in federal court.

Paragraph 2 must be interpreted in the same manner: the Secretary may seek the relief she is empowered to seek in that paragraph, but only after she has been unable to achieve her aims through her own unilateral enforcement authority. As pointed out already, it would be illogical – absurd, even – to think Congress intended the Secretary to have a right to seek a court-ordered closure of a mine based on a far less substantiated record of misconduct (*i.e.*, **any** violations, including merely alleged, non-S&S violations). And, of course, that Congress intended the Secretary to pursue her remedies under § 104(e) before turning to § 108(a)(2) – and that the Secretary has historically recognized this interrelationship between the two provisions – finds support in the legislative history of the Mine Act,[3] as well as a House committee report of a mine safety bill still pending before the current Congress.[4] Freedom Energy does not, of course, stake its entire position on the strength of the legislative history cited here and in its opening brief, but this history is certainly probative and confirming of Congress's intent in structuring the

---

[3] *See*, *e.g.*, Conference Report, S. Rep. 95-461 at 56 (1977) ("the Secretary may seek this [§ 108(a)(2) judicial] remedy when the withdrawal orders available to [her], including the section 104(e) procedure, have been unsuccessful in achieving lasting compliance with the Act and its requirements").

[4] *See* H.R. Rep. 111-579, 111th Cong., 2d Sess. 55 (House, Education and Labor Committee Report on H.R. 5663, the proposed Robert C. Byrd Miner Safety and Health Act of 2010) (noting that § 108(a)(2) had "never been invoked" due to its "interaction with the Mine Act's administrative law provisions" that require MSHA to establish a "pattern" under § 104(e)). Freedom Energy does not cite this recent statement as necessarily indicative of the intent of the Congress that enacted the Mine Act, as the Secretary claims. *See* Opp. Memo at 12 n.13. Rather, it is cited as a reflection of the factual and historical understanding of the current Congress looking at proposed statutory amendments – indeed, in all probability gleaned from the Secretary's own recommendations to Congress for such amendments – that the two provisions are interrelated in the very way Freedom Energy contends here.

statute as it did, and the Secretary does not point to any contradictory legislative history that calls it into question.

Because § 108(a)(2) permits the Secretary to seek an injunction in court only after pursuing her "pattern" remedies under § 104(e), the Court should conclude its analysis under the first step of *Chevron*, without consideration for whether the Secretary's interpretation of § 108(a)(2) is a reasonable one.

### B. The Secretary's Interpretation of § 108(a)(2) Is Not Reasonable.

Even if the Court were to find § 108(a)(2) ambiguous, it must still reject the Secretary's interpretation because it simply is not a reasonable one. *See Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417-18 (1992) ("If the text is ambiguous and so open to interpretation in some respects, a degree of deference is granted to the agency, though a reviewing court need not accept an interpretation which is unreasonable."). *See*, *e.g.*, *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 275 (6th Cir. 1994) ("We hold that, even if the language of the statute can be deemed silent or ambiguous, the Secretary's construction of the statute is *not* permissible. The legislative history of the Medicaid proxy clearly shows that the Secretary's construction is contrary to that intent expressed by Congress.").

Interpreting the Mine Act in the manner espoused here by the Secretary would result in the absurdity that for "a pattern of 'significant and substantial' ('S&S') violations" the Secretary must utilize her own "withdrawal order" authority to achieve compliance at the problem mine, but for a pattern of insignificant and insubstantial violations, the Secretary can go straight to federal court and seek an injunction to close permanently the entire mine. *See* Opp. Memo at 6-7

& nn.4 & 7.  And, moreover, whereas the S&S violations factored into her § 104(e) remedy must be "final" (as required by 30 C.F.R. § 104.3(b)),[5] the non-S&S violations on which the court-ordered injunction may issue need not be, *i.e.*, the "violations" need only be alleged.  In other words, for a pattern of serious, proven offenses (*i.e.*, final S&S violations), the Secretary must pursue a host of administrative remedies and first give the operator an opportunity to correct its hazardous practices; yet, for a pattern of lesser and unproven offenses, the Secretary may go straight to federal court to seek permanent closure of a mine.  On its face, the argument falls apart.

The Secretary makes no attempt to harmonize her reading of the statute with common sense, or to explain why or how her interpretation would avoid the extreme inequity of, for example, one mine with a record of final S&S violations being given an opportunity to improve its safety and health record and thus avoid the constant imposition of unilateral withdrawal orders, as would be its right under § 104(e) and 30 C.F.R. Part 104, while another mine with a record of non-final, unproven, non-S&S (alleged) violations is summoned to federal court to defend against closure based only on the Secretary's "belief" that it is engaged in a pattern of violations that, in the Secretary's judgment, is likely to pose a continuing hazard to miners.  And the Secretary makes no attempt to explain why it would have been rational for Congress to have intended that outcome.

---

[5] The Secretary complains that Freedom Energy mischaracterized the finality requirement as "congressionally mandated," noting that the finality requirement for § 104(e) pattern determinations was the Secretary's own choice.  *See* Opp. Memo at 7-8.  The Secretary has misread Freedom Energy's brief.  The "administrative inconvenience" described by Freedom Energy as being "congressionally mandated" (Memo in Support at 25) is not the finality requirement; rather, it is the requirement to pursue the § 104(e) pattern determination and the resulting administrative remedies and requirements that flow therefrom in advance of seeking a court-ordered injunction under § 108(a)(2).

Obviously, the Secretary has the authority to seek injunctive action under certain circumstances. Section 108(a)(2) gives her that right, and Freedom Energy is not asserting otherwise. But the Secretary would have this Court read each provision in isolation, and decide the meaning of § 108(a)(2) without consideration for what effect her reading would have in application. The Court should avoid that manner of analysis, and instead focus its attention – as Freedom Energy urges – on the statute as a whole. *See K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988) (stating that in ascertaining whether the agency's interpretation is a permissible construction of the language, a court must look to the structure and language of the statute as a whole). As explained in Freedom Energy's opening brief and again in this reply, when the relevant provisions of the statute are taken together and read in harmony, the only sensible interpretation of them is that the Secretary may not invoke the judicial power of this Court under § 108(a)(2) without first pursuing the remedies available to her under § 104(e) and her own Part 104 regulations.[6]

---

[6] The Secretary's contention that her Part 104 regulations embodies a formal interpretation of § 108(a)(2), in addition to § 104(e), is difficult to take seriously. *See* Opp. Memo at 11. Freedom Energy does not question that Part 104 implements Mine Act § 104(e), and thus reflects an interpretation of § 104(e). But Part 104's silence about the interplay between § 104(e) and § 108(a)(2) cannot fairly be deemed an interpretation of § 108(a)(2). By that sophistry, Part 104 might as well be deemed an interpretation of every other Mine Act provision that it "does not address." *Id.* Of course, it is nothing of the sort. Furthermore, despite its contention to the contrary, Opp. Memo at 11, the Secretary's position in this case is by its very nature nothing more than a litigating position – the Secretary has made no public pronouncements about the meaning of § 108(a)(2) other than what she is saying in the papers filed in this case. As a litigating position, her position is not entitled to deference. *See Franklin Fed. Sav. Bank v. Dir., Office of Thrift Supervision*, 927 F.2d 1332, 1337 (6th Cir. 1991).

### C. The Secretary Does Not Have the Broad Prosecutorial Discretion She Claims.

The Secretary's final argument is a tautology: she says she has prosecutorial discretion to invoke § 108(a)(2); that her prosecutorial discretion is not reviewable by the Court; and that, because she has invoked § 108(a)(2) in bringing this action, she has stated a claim. Opp. Memo at 8-12. Very convenient, yes, but not very convincing.

The Secretary's assertion that "[w]hether and when to initiate an action under Section 108(a)(2) is within [her] prosecutorial discretion" and "presumptively unreviewable," Opp. Memo at 8, finds no support in the cases on which she relies, and is undermined by her own acknowledgment that there are "conditions" that must be met before she can bring an action under § 108(a)(2).[7] The Secretary relies primarily on the Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), but her reading of *Heckler* is far off the mark.

In *Heckler,* the Supreme Court addressed whether the Food and Drug Administration's decision *not* to take enforcement under the Federal Food, Drug and Cosmetic Act was reviewable under the Administrative Procedure Act's judicial review provisions. *Heckler*, 470 U.S. at 828. In holding that agency decisions ***not to take*** enforcement actions are "generally committed to an agency's absolute discretion" and thus normally unreviewable, the Court also noted "precisely the opposite situation," that is, the affirmative act of an agency under a statute establishing "clear guidelines" for when an agency can take action. *Id.* at 831. In fact, in

---

[7] Of course, if, by "initiate," the Secretary means no more than the mere physical act of filing a complaint, then she is of course correct that the discretion to take that act rests with her. But clearly, to have any relevance to the motion *sub judice*, the Secretary must be using the word "initiate" to connote the stating of a bona fide claim under § 108(a)(2).

distinguishing an agency's failure to act from an agency's decision to enforce, the Court explained that:

> [W]hen an agency does act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers.

*Id.* at 832.

If the question here was whether the Secretary **should have, but did not** file a claim against Freedom Energy for an injunction at the Freedom #1 Mine – hypothetically, in a lawsuit brought by an individual under the Administrative Procedure Act to compel the Secretary to file the § 108(a)(2) complaint – *Heckler* would be apposite because the Secretary cannot be made to file a § 108(a)(2) action (or any other). But that, of course, is not this case, and the Secretary cannot load the question about her prosecutorial discretion by filing her own lawsuit. It is unsurprising, therefore, that she does not cite a single authority for the proposition that an agency can file a court action and then cloak itself from judicial scrutiny under the guise of "prosecutorial discretion." The very thought is abhorrent to the idea of justice. In the manner she describes her "prosecutorial discretion," it is as though the Secretary would have this Court hold that Rule 12 (and, presumably, Rules 13, 50, and 56, *inter alia*) is not applicable in a § 108(a)(2) action. The entire line of argument is absurd.

The issue before the Court has nothing to do with agency enforcement discretion or whether Congress can "limit an agency's exercise of enforcement discretion." Opp. Memo at 9.[8]

---

[8] Her reliance on *Heckler* for this point is again misplaced. In discussing limits on agency discretion in *Heckler*, the Supreme Court was referring to Congress's ability to circumscribe an agency's authority to determine which cases it will pursue, as was the case in *Dunlop v. Bachowski*, 421 U.S. 560 (1975), where the Court upheld a Court of Appeals' finding that the
(continued…)

14

Rather, having taken the affirmative steps in a court of law to hold Freedom Energy liable and accountable under the Mine Act § 108(a)(2), the issue presented for the Court's attention at this juncture is merely whether the Secretary has stated a claim for relief. Because she failed to allege in her Complaint (because she could not) that she had tried and failed to bring Freedom Energy into compliance from a pattern of violations determination made pursuant to Mine Act § 104(e) and her Part 104 regulations, she has failed to state a claim under § 108(a)(2).

## CONCLUSION

For the reasons stated above and in Freedom Energy's opening brief, the Complaint should be dismissed.

Respectfully submitted,

/s/ David L. Baird
David L. Baird
Charles J. Baird
Baird & Baird, P.S.C.
P.O. Box 351
Pikeville, Kentucky  41502
(606) 437-6276

Timothy M. Biddle, D.C. Bar #89284
Thomas C. Means, D.C. Bar #254318
Daniel W. Wolff, D.C. Bar #486733
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Dated: December 16, 2010                *Attorneys for Defendants*

---

(…continued)

statute at issue required the Secretary to file suit if certain factors were present. *Heckler*, 470 U.S. at 833-34. The decision in *Owens v. Brock*, 860 F.3d 1363, 1367-68 (6th Cir. 1988) is also completely unrelated to the issue at hand, as it involved whether a statute precluded judicial review of an administrative finding under the Federal Employee Compensation Act.

CERTIFICATE OF SERVICE

This shall certify that on the 16th day of December, 2010, the foregoing was electronically filed with the Clerk of the United States District Court by using the CM/ECF system with all counsel of record receiving notice of the electronic filing pursuant to the Court's General Order 05-03.

        /s/ David L. Baird
        David L. Baird